UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

| | |
|---|---|
| MICHAEL BARRINGER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No.: 4:22-cv-43 |
| GE AVIATION SYSTEMS NORTH AMERICA, LLC, | ) ) ) |
| Defendant. | ) ) |

## COMPLAINT AND JURY TRIAL DEMAND

Plaintiff Michael Barringer ("Mr. Barringer"), by counsel, for his Complaint and Jury Trial Demand against GE Aviation Systems North America, LLC ("GE Aviation" or "Defendant") states as follows:

### I.     INTRODUCTION

1.     This is an action brought by Mr. Barringer against GE Aviation, his former employer. Mr. Barringer brings this action against GE Aviation for violations of 42 U.S.C. § 1981 of the Civil Rights Act of 1866 ("Section 1981").

### II.     PARTIES

2.     Mr. Barringer is a resident of Federal Way, Washington.

3.     GE Aviation's headquarters are located at 1 Neumann Way, Cincinnati, Ohio 45215.

4.     GE Aviation operates at a number of different locations, including at an Engine Facility located at 3700 US Highway 52 South, Lafayette, Indiana 47905 (the "Lafayette Location").

5. At all relevant times, Mr. Barringer was employed by GE Aviation and worked at the Lafayette Location.

### III. JURISDICTION AND VENUE

6. This Court has jurisdiction under 28 U.S.C. § 1331.

7. The employment practices alleged to be unlawful were committed within the Northern District of Indiana. Venue is therefore proper under 28 U.S.C. § 1391.

### IV. FACTUAL ALLEGATIONS

8. Mr. Barringer is African American.

9. On January 9, 2017, Mr. Barringer commenced his employment with GE Aviation at the Lafayette Location in the position of Assembly and Test Technician.

10. Throughout Mr. Barringer's employment, he was one of only a few African American employees at GE Aviation's Lafayette Location.

11. GE Aviation manufactures jet engines for commercial and military aircraft.

12. Employees at the Lafayette Location, including Mr. Barringer, assemble the aircraft engines.

13. At all relevant times, the Lafayette Location utilized a flat management structure.

14. At all relevant times, the Lafayette Location had a Plant Leader and hourly employees, such as, Mr. Barringer.

15. Instead of having a layer of middle management, the Lafayette Location followed a "teaming system" where the hourly employees were directly involved in goal development and production planning. The hourly team members also held each other accountable for work performance and compliance with company rules and policies.

16. At all relevant times, Renato Vidal ("Vidal"), was the Plant Leader at the Lafayette Location.

17. At the time of his hire on January 9, 2017, Mr. Barringer was placed on Team Badger.

18. Mr. Barringer remained on Team Badger until approximately June 1, 2018, when Team Badger was dissolved, and Mr. Barringer moved to a newly created, Team Vector.

19. On June 4, 2018, Team Vector created its Team Norms and Expectations. The June 4, 2018, Team Norms and Expectations did not address cell phone usage.

20. Shortly after being moved to Team Vector, several of Mr. Barringer's Caucasian teammates on Team Vector began harassing and treating Mr. Barringer differently compared to his Caucasian teammates because of his race.

21. In July 2018, Todd Cochran ("Cochran"), one of Mr. Barringer's Caucasian teammates on Team Vector, approached him to have a "one-on-one" discussion.

22. Cochran told Mr. Barringer that several of his teammates were concerned about his "work ethic."

23. Cochran told Mr. Barringer that he wanted a detailed written summary of what Mr. Barringer did at work each day. No other member of Team Vector was asked to provide such information.

24. Mr. Barringer reminded Cochran that they were supposed to be equally accountable to one another as teammates and that Cochran was not his supervisor.

25. Cochran also told Mr. Barringer that his shift turnovers were not as detailed as the shift turnovers provided by his teammates.

26. Typically, in a one-on-one discussion, the teammate expresses the team concerns and then the other teammate has to opportunity to respond. Cochran did not follow this process. Cochran did not give Mr. Barringer any opportunity to respond.

27. The following day, Mr. Barringer spoke with Cochran as he had gathered information to demonstrate that his productivity was high, and that his shift turnovers were just as detailed as his other teammates. Mr. Barringer also spoke with the rest of his teammates to address their concerns.

28. Unbeknownst to Mr. Barringer, from that time forward, Cochran continued to review Mr. Barringer's shift turnovers and discuss them with his other teammates. No other member of Team Vector was treated similarly.

29. Mr. Barringer's Caucasian teammates also began criticizing his performance in the presence of other Teams at the Lafayette Location despite the fact that Mr. Barringer was one of the most productive members on Team Vector. Mr. Barringer's teammates did not treat any other member of Team Vector in similarly.

30. On December 11, 2018, Team Vector revised its Team Norms & Expectations to include a policy on cell phone usage.

31. After revising the Team Norms & Expectations, Cochran approached Mr. Barringer and told him that the team was giving him a "Team-on-One." Cochran handed Mr. Barringer a feedback sheet signed by all teammates.

32. The feedback sheet indicated that Mr. Barringer violated the cell phone policy. In response, Mr. Barringer stated that there was no cell phone policy. He also reminded his teammates that everyone in the Lafayette Location used their cell phones in the same way that he

used his cell phone. At that time, Mr. Barringer was not aware that the Team Norms & Expectations had been revised shortly before the meeting.

33. The team also told Mr. Barringer they believed he was not working diligently and not making rates.

34. Every time Mr. Barringer attempted to speak during the Team-on-One he was cut off. Cochran told Mr. Barringer that he could not respond during the Team-on-One and would get the opportunity to respond during a scheduled rebuttal meeting.

35. Following the Team-on-One meeting, Mr. Barringer went to the head of the finance department and asked for his dashboard data. The dashboard data shows level of productivity, etc.

36. The head of finance told Mr. Barringer that Cochran came in the day before requesting Mr. Barringer's dashboard data. Mr. Barringer then told the head of finance about the Team-on-One.

37. The head of finance asked Mr. Barringer if Cochran used the dashboard data. Mr. Barringer stated that he did not use that data. The head of finance then stated that Cochran did not use Mr. Barringer's dashboard data because it did not support the picture that Cochran wanted to paint about Mr. Barringer's performance. The data and other documentation showed that Mr. Barringer was a top performer, and his shift turnovers were on par with his teammates.

38. On December 12, 2018, Mr. Barringer filed a discrimination and harassment complaint with the Lafayette Location's ombudsman, Victor Beckly ("Beckly"). Mr. Barringer told Beckly that he believed he was being discriminated against and harassed because of his race.

39. The investigation took three (3) months to complete, and the investigator only interviewed one (1) of Mr. Barringer's witnesses.

40. On December 13, 2018, Mr. Barringer met with Vidal, the Plant Leader. Mr. Barringer told Vidal that he believed he was being discriminated against and harassed because of his race by Team Vector. Mr. Barringer also told Vidal that he had filed a complaint with the ombudsman.

41. During the December 13 conversation, Mr. Barringer asked Vidal if he could be moved to another team. Vidal told Mr. Barringer that Team Viper was going to split into two (2) teams in early 2019 and when that split happened Mr. Barringer could move to one of the new teams.

42. As of December 2018, the policy regarding team splits was that once a team split into two (2) teams, both teams had to accept employees from other teams who wanted to join. There was no consensus required by the existing team members.

43. On December 17, 2018, Mr. Barringer had a follow-up meeting with Team Vector to respond to the Team-on-One. Mr. Barringer did not get one word out before Cochran started shouting and yelling at him. Other members of Team Vector also cut Mr. Barringer off when he attempted to address the issues raised in the Team-on-One.

44. On December 18, 2018, Cochran texted Mr. Barringer and asked him to come to work early to settle any conflicts. Cochran also texted that he was sorry for losing his composure on December 17.

45. On December 19, 2018, due to the discrimination and harassment he was experiencing, Mr. Barringer went to the emergency room and was held for observation.

46. On December 24, 2018, Mr. Barringer met with Vidal a second time. Vidal told Mr. Barringer that he believed there was just a "misunderstanding" between Mr. Barringer and his teammates.

47. In late December 2018 or early January 2019, Mr. Barringer filled out an application to join Team Evolution.

48. In January 2019, Kyle Goodnight moved from Team Vector to Team Evolution.

49. On January 21, 2019, Mr. Barringer was notified that Team Evolution rejected his application to join the team.

50. On March 7, 2019, GE Aviation told Mr. Barringer that his discrimination and harassment complaint was "unsubstantiated" and that he simply misunderstood his teammates' actions.

51. Thereafter, Mr. Barringer continued to be berated, micromanaged, and criticized on a daily basis by his Caucasian teammates.

52. During the week of April 13, 2019, Team Vector gave Mr. Barringer a 360-performance evaluation. It was the worst evaluation Mr. Barringer ever received during his employment with GE Aviation, and by far, the worse of anyone on the team.

53. Mr. Barringer's evaluation took twice as long as his other teammates to discuss.

54. Mr. Barringer's Caucasian teammates told him that he had to write a personal development plan and get a coach. With these actions, Team Vector was moving towards terminating Mr. Barringer.

55. None of Mr. Barringer's Caucasian teammates were required to write a personal development plan and or get a coach.

56. On April 22, 2019, Mr. Barringer filed a charge of race discrimination with the Indiana Civil Rights Commission ("ICRC").

57. By the time Mr. Barringer filed his charge of race discrimination, another Caucasian teammate, Kevin Goodman, was able to leave Team Vector and join Team Evolution.

58. As a result of the continued harassment and discrimination, Mr. Barringer was on sick leave from May 8, 2019, through May 10, 2019.

59. Mr. Barringer returned to work on May 11, 2019, and the harassment and discrimination continued.

60. As a result, Mr. Barringer took a second sick leave from June 7, 2019, through June 14, 2019.

61. On June 18, 2019, Mr. Barringer returned to work and learned that employees on other teams were stating that Team Vector was trying of "offload" their problem—Mr. Barringer.

62. On July 2, 2019, Team Viper split into two (2) teams. Vidal told Mr. Barringer in December 2018, that when Team Viper split, Mr. Barringer could join one of the new teams.

63. However, after Mr. Barringer filed his discrimination and harassment complaints, and in retaliation for filing such complaints, Vidal changed the team splitting policy to require a 100% consensus from the team. Mr. Barringer spoke to members on both of the new teams and was told there was not 100% consensus for him to join.

64. Given that the harassment and discrimination continued, on July 22, 2019, Mr. Barringer went to Human Resources and requested to take leave under the Family and Medical Leave Act ("FMLA"). Mr. Barringer reiterated his concerns with Human Resources regarding discrimination and harassment. Human Resources provided Mr. Barringer the information to start the FMLA process.

65. Mr. Barringer then left the Lafayette Location and went to see his physician.

66. After returning home from his physician's office, Mr. Barringer sent an email to Team Vector stating that he took a sick day and would likely be out for the rest of the week.

67. In response, Mr. Barringer's Caucasian teammates sent him a slew of emails that berated and criticized him.

68. Mr. Barringer was on FMLA leave from July 22, 2019, until September 2, 2019. During that time, Mr. Barringer was diagnosed with depression and anxiety, and he attended therapy sessions with a counselor.

69. On September 3, 2019, Mr. Barringer returned to work. Nothing changed when Mr. Barringer returned, and the discrimination and harassment continued to impact his health to the point where his physician and therapist advised him to leave GE Aviation.

70. On September 16, 2019, Mr. Barringer had no choice but to leave his employment with GE Aviation and was constructively discharged.

## COUNT I
### (*Section 1981 – Race Discrimination*)

71. All preceding paragraphs are incorporated herein by reference.

72. As set forth above, GE Aviation engaged in intentional race discrimination against Mr. Barringer in the terms and conditions of his employment in violation of 42 U.S.C. § 1981 including both race-based hostile work environment and race-based disparate treatment.

73. GE Aviation intentionally caused infringement of Mr. Barringer's rights pursuant to 42 U.S.C. § 1981.

74. GE Aviation's unlawful discriminatory acts caused Mr. Barringer to suffer economic damages, including lost wages as well as emotional distress and physical distress.

75. GE Aviation acted with malice and/or reckless indifference to Mr. Barringer's rights, entitling him to an award of punitive damages.

76. GE Aviation is liable to Mr. Barringer for back pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post judgement interest, and attorneys' fees and costs.

### COUNT II
**(*Section 1981 – Retaliation*)**

77. All preceding paragraphs are incorporated herein by reference.

78. GE Aviation retaliated against Mr. Barringer in the terms and conditions of his employment on the basis of his protected activities, in violation of 42 U.S.C. § 1981.

79. GE Aviation intentionally caused infringement of Mr. Barringer's rights pursuant to 42 U.S.C. § 1981.

80. GE Aviation's unlawful discriminatory acts caused Mr. Barringer to suffer economic damages, including lost wages as well as emotional distress and physical distress.

81. GE Aviation acted with malice and/or reckless indifference to Mr. Barringer's rights, entitling him to an award of punitive damages.

82. GE Aviation is liable to Mr. Barringer for back pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post judgement interest, and attorneys' fees and costs.

### V.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Michael Barringer prays for a judgment in his favor against GE Aviation, and respectfully requests that the following relief be awarded:

a) Order GE Aviation to make Mr. Barringer whole by providing appropriate back pay with pre-judgment interest, in an amount to be determined at trial;

b) Order GE Aviation to make Mr. Barringer whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including medical expenses, in amounts to be determined at trial;

c) Order GE Aviation to make Mr. Barringer whole by providing compensation for past and future non-pecuniary losses resulting from the unlawful employment practices complained of above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial;

d) Order GE Aviation to pay Mr. Barringer punitive damages for its malicious and/or reckless conduct described above in amounts to be determined at trial;

e) Order GE Aviation to pay for the costs of this action including reasonable attorneys' fees and any such further relief as the Court may deem just, proper, and equitable; and

f) Grant such further relief as the Court deems necessary and proper in the public interest.

## VI. JURY TRIAL

Mr. Barringer demands trial by jury on all issues so triable.

Respectfully submitted,

*s/Kimberly D. Jeselskis*
Kimberly D. Jeselskis, Attorney No. 23422-49
MacKenzie A. Watson, Attorney No. 36139-32
JESELSKIS BRINKERHOFF AND JOSEPH, LLC
320 North Meridian Street, Suite 428
Indianapolis, Indiana 46204
Telephone: (317) 220-6290
Facsimile: (317) 220-6291
kjeselskis@jbjlegal.com
mwatson@jbjlegal.com

*Counsel for Plaintiff Michael Barringer*