**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| MICHAEL BARRINGER, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) NO. 4:22CV43-PPS |
| GE AVIATION SYSTEMS NORTH | ) |
| AMERICA, LLC, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Michael Barringer, who is African American, worked as a technician for GE

Aviation Systems North America, LLC, and alleges he was subjected to a racially hostile

work environment, as well as race discrimination and retaliation, until he was basically

forced to resign.  His complaint is brought under 42 U.S.C. § 1981.  GE Aviation now

seeks summary judgment on all three claims.  Because there is no evidence that

Barringer was subjected to a racially hostile work environment, and he was not subjected

to an adverse employment action by GE Aviation, summary judgment will be granted.

**Summary Judgment Standard**

Summary judgment must be granted when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(a).  A party opposing summary judgment may not rely on allegations or denials in his

or her own pleading, but rather must "marshal and present the court with the evidence

[he] contends will prove [his] case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654

(7th Cir. 2010). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

I have considered the evidence of record cited in support of each parties' factual assertions. Fed.R.Civ.P. 56(c)(3). Also, at my option, I have considered other materials in the record. *Id.* Where either party claims to dispute an asserted and supported fact, but has not cited to evidence of record to support the dispute, or shown that the materials cited by the opposition do not support their assertion, I consider the asserted fact to be undisputed. Fed.R.Civ.P. 56(c)(1)(A) and (B). Whether the fact is material is a determination I make separately. If I have determined an undisputed fact to be immaterial, I do not include it here. I must construe all facts in the light most favorable to plaintiffs, and view all reasonable inferences in their favor. *Biggs v. Chicago Bd. of Educ.*, 82 F.4th 554, 559 (7th Cir. 2023); *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020). Applying these principles and practices, the summary judgment determination is based on the following facts, either undisputed or disputed but construed in plaintiffs' favor.

## Material Facts

Barringer worked at GE Aviation from January 9, 2017 through September 16, 2019. [DE 45 at 1.] He was an Assembly and Test Technician in the Lafayette Engine Facility ("LEF"). *Id.* The facility has an interesting management structure which is very much employee driven. Employees are assigned to teams which consist of between 9-20

2

individuals. [*Id.* at 2.]  Each team creates and maintains its own set of "Norms and Expectations," or rules and guidelines for the team.  *Id.*  Sometimes new teams are created, and sometimes a team might split into two.  *Id.*  LEF doesn't have a middle management level; rather, the teams are made of individual employees who are equal and accountable to each other and charged with self-governance. [*Id.* at 3.]  In other words, LEF is a "flat organization" and all team members hold each other accountable. [DE 48 at 2.]  There is also a Plant Leader that has a supervisory role.  When Barringer started, his Plant Leader was Eric Matteson, but from August 2018 until Barringer resigned, his Plant Leader was Renato Vidal. [DE 45 at 3.]

There were various councils at LEF, including a Positive Discipline Council, which initiates disciplinary actions against Technicians. [*Id.* at 4.] Any employee at LEF could raise a performance issue to the Council, Human Resources Support, or Plant Leader. [*Id.* at 4-5.] There is a performance management process at LEF, which includes: (1) issue identification; (2) one-on-one discussion; (3) Team Level or team-on-one discussion; (4) coaching plan; (5) Positive Discipline ("PD") council; (6) Plant Leaders; and (7) peer review. [DE 45 at 4; Jeselskis Dec., DE 46-4 at 6.]  Members of a team could take issues about another team member to the PD Committee.  *Id.*  Additionally, if a Plant Leader thought a termination should happen immediately, a Plant Leader could bypass the PD Committee and terminate the employee.  Barringer was never the subject of a PD Council concern or investigation and never received discipline during his employment. [DE 45 at 7.]  However, he did receive a one-on-one, a formal team-on-one,

and a personal development plan and coach, all of which, as stated, are specifically part of the performance management plan at LEF. *Id.*

When Barringer started at LEF, he was on team Badger. [*Id.* at 8.] He basically did well on this team, didn't have issues with anyone, and received feedback that he was meeting expectations. [*Id.* at 8-9.] In June 2018, Team Badger was disbanded and Barringer was put on a newly-formed Team Vector. [*Id.* at 9.] Barringer had the same job title and responsibilities on this new team. *Id.* However, he wasn't nearly as happy. Team Vector had about 10 team members and Barringer was the only black team member for most of the time he was on Team Vector. [DE 48 at 5.]

In July 2018, just a month into his new team, Barringer received a one-on-one feedback from his peer and fellow Team Vector member, Todd Cochran. [DE 45 at 11.] Cochran told Barringer that several of the team members were concerned about his work ethic. [*Id.* at 11-12.] Cochran also stated that Barringer's shift turnovers (at the end of the shift the team member let the next employee know what work was completed) were not as detailed as other team members. [*Id.* at 12.] In a tit-for-tat moment, Cochran told Barringer he wanted a detailed summary of what Barringer did every day, so Barringer responded that he too wanted a detailed summary from Cochran since they were both answerable to one another. *Id.*

After that initial meeting, Cochran started to track Barringer's performance. [*Id.* at 14.] For example, he reviewed Barringer's pass downs and analyzed Barringer's electronic build record. *Id.* Barringer claims around this time, Cochran began

responding to Barringer's shift turnover e-mails in an accusatory and condensing way, something he didn't do to other technicians. *Id.*

Cochran also had another team-on-one meeting with a different Team Vector member, Morgan Davis, and learned from Davis that he was having similar issues with Barringer including problems with his pass downs. [DE 45 at 16.]  When Cochran investigated, he found that some of Barringer's time stamps, pass downs, and time records did not match up. *Id.*

On December 11, 2018, Team Vector held a team-on-one with Barringer. [*Id.* at 17.] Barringer frames the meeting as him being accused and confronted by certain white members of his team, and not being given a chance to tell his side of the story. *Id.* During the meeting, Barringer was handed a formal feedback sheet which included a slew of "findings" of observed behavior: phone use, extended breaks, not promptly starting, not working diligently, lack of detail in pass downs, not accepting feedback, making poor decisions when faced with adversity in production, showing lack of understanding of team needs, not using GE systems correctly to move work forward when faced with production issues or problem solving steps, and having a poor rapport with techs on other teams. [DE 45 at 19.]  Not surprisingly, Barringer disagreed with these findings, and when he mentioned there was no cell phone policy in place, he learned the team norms had been changed that very same day. *Id.*  Barringer admitted in his deposition that he was on his phone on the production floor, but claims it was not as much as his co-workers claimed. [Barringer Dep., DE 38-1 at 99.]  Barringer concedes

that nobody said anything about race during the meeting. [*Id.* at 149.]  The team-on-one did not result in Barringer receiving any discipline such as suspension, termination, or any loss in pay or benefits. [DE 45 at 21.]

Two days after the team-on-one, Barringer met with the supervisor, Mr. Vidal.  At the meeting, Barringer told Vidal that he believed his team members were discriminating against him and harassing him because of his race. [*Id.* at 22.]  Barringer also told Vidal that he filed a complaint with the ombudsman. [*Id.* at 23.]  Barringer also alleges that he discussed the possibility of joining a different team.  According to Barringer, Vidal told him that Team Viper was going to split in early 2019 and that when the split occurred, Barringer could have a place on one of two new teams. [Barringer Dec., DE 46-2, at 7.]  Vidal denies making any promise to Barringer about giving him a spot on any newly formed team. [Vidal Dep., DE 38-2, at 66.]

In response to the team-on-one, Barringer asked the Finance Manager to pull together data about him to show his productivity. [DE 48 at 18.]  GE Aviation disputes that the dashboard data is a complete and true measure of productivity [*Id.* at 21], but according to Barringer, the dashboard data shows that in the six months Team Vector existed (June 2018-November 2018), Barringer was above average on production time three out of the six months. [Barringer Dec., DE 46-2 at 6; Ex. E.]  Additionally, Barringer was under the average on production by only 3% on two out of the three months that he was under production.  *Id.*  At the end of the six months, Barringer claims he had the third highest number of production and teaming hours on the team. [*Id.* at 7.]  While this

is somewhat of a subjective claim, Barringer collected shift turnover emails that he and his co-workers drafted, and claims they all had the same level of detail yet he was the only team member scrutinized for the quality of his shift turnover emails. [*Id.*, Ex. F.] Barringer e-mailed the dashboard data and copies of shift turnover emails to the ombudsman when Barringer submitted his internal complaint (what GE Aviation calls an "Integrity Concern".) [DE 45 at 25.]

The ombudsman, Victor Beckley, reviewed Barringer's concern and his supporting documents, and they met. [DE 45 at 24-25.] At the meeting, Barringer claims he told Beckley he was being discriminated against because of his race. [Barringer Dec., DE 46-2 at 6.] However, Beckley denies Barringer complained of discrimination, disparate treatment, or harassment because of his race. [Beckley Dep., DE 38-5, at 19.]  As a result, when Beckley typed up a summary of the meeting with Barringer, the complaint he submitted for investigation did not include any information regarding race discrimination. [DE 45 at 27.]

On December 17, 2018, Barringer met with Team Vector to respond to the team-on-one. [DE 45 at 22.] Barringer claims he did not get out a word before Cochran started to shout and yell at him, and Cochran told him he could not address what was said to him during the team-on-one. [Barringer Dec., DE 46-2 at 8.]

GE Aviation's Bryan Macfarlane, who worked in Human Resources, investigated Barringer's internal complaint. [DE 45 at 27.]  Macfarlane interviewed several people, including Barringer and Cochrane, and determined Barringer's concern was

unconfirmed, and that Barringer's team had been giving him feedback in good faith. [*Id.* at 28.]

In late 2018 or early 2019, Barringer applied for one of two open positions on Team Evolution. [*Id.* at 32.] Barringer interviewed with Team Evolution, and was asked straightforward questions, but he was not offered a spot on the team. *Id.* In its correspondence to Barringer, Team Evolution stated, "[b]ased on our assessment of your responses, you would not be a good fit at this time" and further recommended "growth in finding balance between business and production needs, ownership during the process of receiving and giving feedback, [and] the importance of follow up in conflict resolution and trying to see value in the opinion of others even when you may not agree with their assessment of the situation." [*Id.* at 33.]

Barringer suspects that Team Vector poisoned the well by giving Team Evolution a poor recommendation about him. *Id.* This is confirmed by the fact that Kyle Goodnight, a white team member who was on Team Vector but moved to Team Evolution around January 2019, told Barringer that Team Vector had "nothing good to say about [Barringer]." [Barringer Dec., DE 46-2 at 9.] Although Barringer thought switching out of Team Vector would solve his problems at work, it is undisputed that even if Barringer had moved to Team Evolution, his title, job, pay, and benefits would have remained the same. [DE 45 at 33.]

Barringer had started with GE Aviation as a Technician Level Zero. [*Id.* at 34.] At some point, he progressed to Technician Level One and received a pay raise. *Id.* In

8

January 2019 (after Cochran's one-on-one feedback with Barringer, Team Vector's team-on-one, and Barringer's submission of his December 13, 2018 complaint), Team Vector recommended Barringer advance from Technician Level One to Technician Level Two. *Id.* Barringer received a pay raise when he was promoted to Technician Level Two. [*Id.* at 35.]

On April 17, 2019, Team Vector gave Barringer his annual review. [*Id.* at 35.] According to Barringer, he felt his review was really bad, that his yearly performance evaluation took twice as long to go through compared to his other teammates, and he was upset when Cochran told him during the meeting that Barringer had to come up with a personal development plan and get a coach. [DE 45 at 35-36.] Barringer viewed the coaching plan as one step closer to his termination, plus he thought it was hamstringing his ability to get off Team Vector since a technician is not allowed to move to a new team if he is on a performance improvement plan and has a coach. [*Id.* at 36.] For what it is worth, Cochran, who is white, also received a poor annual review from Team Vector, and he was also placed on a performance improvement plan and provided a coach around the same time as Barringer. *Id.*

On April 23, 2019, Barringer filed a Complaint of Discrimination with the Indiana Civil Rights Commission. *Id.* Barringer received a no probable cause decision from the ICRC after its investigation, and the EEOC adopted the ICRC's findings. [DE 45 at 37.]

After the submission of his ICRC Complaint, Barringer took some sick time—he requested and was granted six weeks of FMLA leave. *Id.* Barringer claims he was off

work due to stress and anxiety related to his work situation. *Id.* On July 22, 2019, he had

to go into work early to attend a class, and called a mental health counselor at the

Employee Assistance Program because he felt so anxious. *Id.* After consulting with his

Human Resources Director, Barringer decided to stay on medical leave through August

2019. [*Id.* at 37.] According to Barringer, he received several confrontational e-mails from

his teammates after he took sick leave (some were upset Barringer had not informed

them of his intent to take sick days), but Cochran shut down the chatter, stating "[l]et's

retire this e-mail communication and recalibrate upon [Barringer's] return . . .

[Barringer], take the necessary time needed to get your health in order." [DE 48 at 38; DE

46-2 at 66.]

     While on medical leave, Barringer started to see a therapist. Barringer claims his

doctor and therapist talked with him about how the job at LEF was impacting his health,

and they recommended he leave his employment at GE Aviation. [DE 45 at 38.] While

he was still on FMLA leave, Barringer was offered a job as a mechanic at a different

company, and he accepted the job with plans of starting on October 6, 2019. *Id.* As a

result, on September 16, 2019, Barringer resigned his employment with GE Aviation. *Id.*

He felt his physical and mental health were suffering and it was impossible for him to

still work at the plant. *Id.* He claims he "took a job making substantially less money just

to get out of the toxic work environment." [Barringer Dec., DE 46-2, at 12.]

     Barringer concedes that no one ever made a comment to him that he found racist

or racial in nature during his employment with GE Aviation, and he never heard any

such comments directed to or about anyone else. [DE 45 at 40.]  While he received the one-on-one, a formal team-on-one, a poor annual review, a development plan and coach, and was recommended that he be placed on a coaching plan (all things that are part of the performance management at LEF), he never received any discipline, decrease in pay, benefits, or job responsibilities while employed with GE Aviation.  *Id.*

Barringer pursues three claims all under Section 1981: race discrimination, a racially hostile work environment, and retaliation. GE Aviation has moved for summary judgment on all of the claims. [DE 35.]

### Discussion

As the Seventh Circuit made clear in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), the correct standard on summary judgment in this employment discrimination case "is simply whether the evidence would permit a reasonable factfinder to conclude that [plaintiff's] race caused the . . . adverse employment action." *Owens v. Old Wisconsin Sausage Co., Inc.*, 870 F.3d 662, 666 (7th Cir. 2017).  In making this determination, distinctions are not to be made between so-called "direct" and "indirect" evidence.  *Ortiz*, 834 F.3d at 765.  The burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S 792 (1973), can still be used as a means to "organize, present, and assess evidence in discrimination cases." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).  But plaintiffs are not required to meet the *McDonnell Douglas* standards to survive summary judgment; instead they "may prove

discrimination in a holistic fashion." *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023).

     This holistic approach is clearly applied by Barringer, as he cites *Johnson,* 892 F.3d at 894 (stating "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself."). [DE 44 at 4.]  However, even viewing all of the evidence together in the light most favorable to Barringer, no reasonable factfinder could find that Barringer's race was the reason behind the events that unfolded in this case.

     To succeed on a claim that Barringer suffered an adverse employment action because of his race, he must be able to persuade a jury that his race "caused the [adverse employment action]." *Ortiz*, 834 F.3d at 765.  The "'sole question that matters'" is "whether a reasonable jury could conclude that [plaintiff] suffered the adverse employment action because of his membership in a protected class." *Reives v. Illinois State Police*, 29 F.4th 887, 892 (7th Cir. 2022), quoting *Ortiz*, 834 at 763-64.  Of course, this means there must be proof that an adverse employment action occurred in the first place. *Wince*, 66 F.4th at 1040.

     As to the claim of retaliation, to survive summary judgment Barringer must produce evidence that he engaged in statutorily protected activity, that materially adverse action was taken against him by GE Aviation, and of a causal connection between the two.  *Adebe v. Health and Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022).  Circumstantial evidence may be relied on to "supply the causal link...from

which a jury may infer intentional discrimination." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). "Relevant circumstantial evidence may include 'suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual.'" *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019), quoting *Greengrass*, 776 F.3d at 486. "Regardless of the type of evidence presented, [t]he key question is whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action.'" *Gnutek v. Illinois Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023), quoting *Rozumalski,* 937 F.3d at 919.

In short, under both his Section 1981 discrimination and retaliation claims, Barringer has to show that he was subjected to a materially adverse employment action. *See Carter v. Chicago State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015) (to succeed on a 1981 retaliation claim, the plaintiff must demonstrate he suffered an adverse employment action); *Jordan v. Evans*, No. 22-1316, 2024 WL 2271839, at *2 (7th Cir. May 20, 2024) (finding the discrimination constituted an adverse employment action is an essential element of race discrimination under § 1981). This is where Barringer's claim falls apart.

### 1.    Adverse Employment Action?

It is well settled that not everything that makes an employee unhappy is an actionable adverse employment action. Federal law "does not protect against petty slights, minor annoyances, and bad manners," *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016), and "is not intended to reach every bigoted act or gesture that a worker might

13

encounter in the workplace." *Thompson v. Mem'l Hosp. Of Carbondale*, 625 F.3d 394, 406 (7th Cir. 2010). Rather, "[a]n adverse employment action is one that significantly alters the terms and conditions of the employee's job." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). For example, adverse employment actions include "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce further career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Reives v. Ill. State Police*, 29 F.4th at 894.

Barringer submits a number of actions he perceives to be adverse actions, but none of these rises to the level of the first two categories. He was never discharged, his pay wasn't reduced (to the contrary, he got a raise before he left), and there was no other reduction in his salary, benefits, or pay. Barringer was put on Team Vector when his previous team disbanded, and there is no evidence he was transferred there to let his skills atrophy - quite the opposite, he was a very busy member of that active team.

To the extent Barringer disliked the feedback he received from his teammates, either individually or collectively through the one-on-one with Todd Cochran, his team-on-one, and his annual review, the Seventh Circuit "has never held, and in fact has explicitly rejected, that poor performance reviews alone can be the basis for a finding of an adverse employment action by the employer." *Chaib v. Indiana*, 744 F.3d 974, 984 (7th Cir. 2014). It has repeatedly emphasized that "[u]nfair reprimands or negative

14

performance reviews, unaccompanied by tangible job consequences," are not legally actionable employment actions. *Boss*, 816 F.3d at 919; *see also Gupta v. City of Chicago*, No. 16 C 9682, 2017 WL 2653144, at *3 (N.D. Ill. June 20, 2017) (negative performance reviews are not actionable adverse employment action); *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) (holding poor evaluations alone do not constitute an adverse employment action); *Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017) (negative performance reviews, written warnings, and placement on performance improvement plans are not adverse actions when they are unaccompanied by a quantitative or qualitative change in the terms of employment).

The Seventh Circuit recently found in *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1042 (7th Cir. 2023), that the plaintiff's complaint about his supervisors assigning him to clean drains and reprimanding him for failing to fulfill a work assignment did not constitute an adverse action because cleaning the drains fell within the duties of a stationary engineer and the verbal reprimand did not come with a loss of pay or other tangible consequence. The Seventh Circuit rationalized that "[n]either requiring an employee to do his job nor scolding him amounts to an adverse action." *Id.*

Barringer tries to spin his desire to move to another work team as an actionable adverse employment, but I don't see it that way. Such a move would be completely lateral, and not hold any changes other than the people he would be working with. Indeed, Barringer admitted a transfer to the new team would not have changed his title, pay, benefits, or any other aspect of his employment. [Barringer Dep., DE 38-1, at 262.]

This denial of reassignment doesn't constitute an adverse employment action. *See Henyard v. MV Transp.*, No. 15 C 10835, 2019 WL 1399953, at *5 (N.D. Ill. Mar. 28, 2019) (finding while plaintiff may have preferred a different assigned bus route, because the sought after route would not have affected her pay, duties, or job title in any way, it was not actionable); *Taylor v. Brown*, 295 F.3d 783, 789 (7th Cir. 2002) (denial of plaintiff's requested different job duties not an adverse employment activity because she was not fired, demoted, or disciplined, her pay was not affected, and her job responsibilities did not diminish). For all of these reasons, the feedback from members of his team and inability to switch teams do not constitute an actionable adverse work action.

### 2.    Hostile Work Environment

As noted above, the Seventh Circuit has noted the broad nature of an adverse employment action under section 1981 can include a hostile work environment. *See Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012). To establish a hostile work environment, the plaintiff must offer evidence that (1) the work environment was both subjectively and objectively offensive; (2) his race was the cause of the harassment; (3) the conduct was he was subjected to was severe or pervasive; and (4) there is a basis for employer liability. *Milligan v. Bd. of Trustees of S. Ill. Univ.*, 686 F.3d 378, 383 (7th Cir. 2012); *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2019). While the employee doesn't need to show that the complained of conduct was explicitly racial, the plaintiff must show it had a racial character or purpose. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544-45 (7th Cir. 2011) (affirming dismissal of hostile work environment claim where

there was no allegation of "racial slurs, epithets, or other overtly race-related behavior").

Whether a behavior is severe or pervasive enough to create a hostile work environment

depends on "all the circumstances," including "the frequency of the discriminatory

conduct: its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work

performance." *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018) (citations

omitted).

Barringer has failed to produce evidence to show the conduct complained of is

objectively offensive and severe or pervasive, plus he has not demonstrated any

connection to race. The Cochran one-on-one session, the team-on-one meeting with

Team Vector, the annual review, the requirement to go on a personal development plan

with a coach, and other work-related feedback Barringer received are not harassment.

These are events built into the management structure of GE Aviation. *See Beamon v.

Marshall & Ilsley Trust Co.*, 411 F.3d 854, 864 (7th Cir. 2005) (finding no inherently racial

component to an employer giving an employee a critical, even an unfairly critical,

performance review).

In this case, Barringer admits his one-on-one with Cochran occurred due to a

perceived "lack of detail and [Barringer's] turnovers and [his] productivity." [Barringer

Dep., DE 38-1, at 136.] This feedback seems entirely related to work and not touching

upon race at all. Barringer admitted that regarding team-on-ones, "everyone on the

team has the right to tell you what they think—you know, tell you about—you know,

what you're doing." [Barringer Dep., DE 38-1, at 56, 72, 90.] Team Vector gave Barringer

the team-on-one based upon perceived communication and production issues.

[Barringer Dep., DE 38-1, at 135-36, 140; Cochran Dep., DE 38-4, at 75, 83, 90.]  This type

of meeting is a routine way of handling things within teams at GE Aviation.  While

Barringer goes on at length in his memorandum in opposition, describing the feedback

he received and that he subjectively characterizes was negative, accusatory and

condescending, he does not cite one case at all to support his position that feedback like

this can constitute a hostile work environment. [DE 44 at 6-10.] That's because there

aren't any for cases like this where, even if one considered the conduct in this case as

some form of harassment, it isn't severe plus it is facially neutral and does not reveal any

racial hostility.

Aside from the actual feedback, Barringer claims Team Vector ostracized him by

not talking to him and not sitting next to him at lunch or meetings, which affected his

reputation across the plant. [DE 44 at 10.] And in his response, Barringer claims Cochran

verbally insulted him after he reported concerns about an engine module [DE 44 at 18].

These are trifles.  And even taking these allegations as true, Barringer provides no

evidence whatsoever that his co-workers did these things *because* of his race.  *See Paschall

v. Tube Processing Corp.*, 28 F.4th 805, 814 (7th Cir. 2022) (finding no connection to race

even where plaintiffs contended they had to do harder jobs than white employees and

were denied overtime or opportunities for bonuses); *Dandy v. United Parcel Serv., Inc.*,

388 F.3d 263, 272 (7th Cir. 2004) (noting although racial epithets are not a prerequisite to

finding a race-based hostile work environment, they factor into the analysis of objective offensiveness).

In *Wince*, the Seventh Circuit looked at a similar situation, where one colleague told the plaintiff (who was black) he was not liked and another told him he didn't have a future in the company. *Wince*, 66 F.4th at 1042. The Seventh Circuit found the comment "was at most rude or unpleasant; nothing about its context suggests that it was racially motivated." *Id.* (quotation omitted); *see also Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 546 (7th Cir. 2011) (holding no discrimination where coworker's hostile and aggressive attitude was not linked to a racial animus).

In this case, Barringer himself admits that, during his time working at GE Aviation, no one ever made any comment to him that he found racist in nature, and he never saw anything that he found offensive or inappropriate from a race perspective. [Barringer Dep., DE 38-1, at 73.] His theory is that "as far as [he was] concerned, it was race" because he was the only black person on the team and it couldn't have been anything else, because he was a productive member. [*Id.* at 130.] But Barringer's subjective feeling about what must have been going on, without more, is just not enough to survive summary judgment on a race discrimination case. *See Adebe*, 35 F.4th at 607 (the fact that plaintiff disagreed with her supervisor's assessment of poor communication skills does not establish pretext when the plaintiff offered no contrary evidence); *see also Boss*, 816 F.3d at 920 (concluding plaintiff had not suffered from an objectively hostile work environment after being placed on a performance improvement

19

plan, marked as absent without leave, and criticized for not attending a conference where "the record contain[ed] not a single racially offensive email, remark, or other hint of racial animus."); *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006) ("if the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed.").

To support his belief of racial discrimination, Barringer also submitted affidavits from two other LEF employees, Phil Vanhorenbeck [DE 46-8] and Kevin Goodman [DE 46-3] who stated they thought Barringer had a good work ethic. That may well be the case, but it is neither here nor there. These employees don't contend race played any role at all in the work-related feedback. *Id.* In addition, Barringer refers to two other past EEOC charges where black team members alleged they received different feedback and discipline at GE Aviation than their white co-workers. [Jeselskis Dec., DE 46-4, at 1-2, Attachments B and C.] But these past allegations seem overshadowed by the recent and very relevant fact that Todd Cochran, who is white, and played a part in Barringer's harassment claims, himself received negative feedback and was also placed by Team Vector on a personal development plan with a coach. [Cochran Dep., DE 38-4, at 46-49.] Thus, it seems a similarly situated white employee was treated the same as Barringer regarding feedback, which negates any implication that black employees were systematically treated differently than white employees at the plant.

In sum, "not every perceived unfairness in the workplace may be ascribed to a discriminatory motivation merely because the complaining employee belongs to a racial minority." *Paschall*, 28 F.4th at 814.  For all of these reasons, Barringer's attempts to establish an adverse employment action through proof of a hostile work environment fails.

### 3.    Constructive Discharge

As noted above, a constructive discharge can also qualify as an adverse employment action. *Wince*, 66 F.4th at 1043.  "It occurs when a plaintiff is forced to resign because of unbearable working conditions."  *Id.* (citing *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2001)).  But to go this route, Barringer has "to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress." *Chapin*, 621 F.3d at 679; *see also Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) (a plaintiff must "demonstrate a discriminatory work environment even more egregious than the high standard for hostile work environment.").

Barringer claims GE Aviation constructively discharged him by making his employment so intolerable that he had no choice but to quit.  That's simply not the case. What happened is that Barringer interviewed for another job while he was on medical leave from GE Aviation, and then voluntarily resigned once he secured a job working at another employer.  As I explained earlier, there were no racial epithets or slurs in this case, and no incidents that could collectively even rise to the level of a hostile work

environment.  And because he cannot show that he was subjected to a hostile work environment, Barringer necessarily cannot prevail on his constructive discharge claim.

### Conclusion

For the foregoing reasons, Defendant GE Aviation Systems North America LLC's Motion for Summary Judgment [DE 35] is GRANTED, and the case is DISMISSED WITH PREJUDICE.  The Clerk is ORDERED to CLOSE this case.

SO ORDERED.

ENTERED: September 23, 2024.

 /s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT